[Cite as *State v. Gerald*, 2014-Ohio-3629.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,              :

                                  :

     Plaintiff-Appellee,      :     Case No. 12CA3519

                                  :

     vs.                         :

                                  :     <u>DECISION AND JUDGMENT</u>
                                  :     <u>ENTRY</u>

DAVID K. GERALD,      :

                                  :

     Defendant-Appellant.   :     **Released: 08/21/14**
_____

<u>APPEARANCES:</u>

Matthew F. Loesch, Portsmouth, Ohio, for Appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, and Julie Hutchinson, Assistant Prosecuting Attorney, Portsmouth, Ohio, for Appellee.
_____

McFarland, J.

    **{¶1}** This is an appeal from a Scioto County Common Pleas Court judgment of conviction and sentence. A jury found David Gerald, defendant below and Appellant herein, guilty of: (1) two counts of aggravated murder; (2) murder; (3) aggravated arson; (4) arson; (5) three counts of tampering with evidence; (6) kidnapping; and (7) conspiracy to commit aggravated murder/murder.  On appeal, Appellant raises eight assignments of error, as follows:

## ASSIGNMENTS OF ERROR

"I.     THE TRIAL COURT ERRED WHEN IT OVERRULED
       APPELLANT'S MOTION TO DISMISS AND/OR TO
       PREVENT THE STATE OF OHIO FROM INTRODUCING
       EVIDENCE REGARDING THE ALLEGED MURDER
       WEAPONS.

II.     APPELLANT'S CONVICTIONS FOR (A) AGGRAVATED
       MURDER, (B) FELONY MURDER, (C) MURDER, (D)
       KIDNAPPING, (E) AGGRAVATED ARSON, (F) ARSON, AND
       (G) TAMPERING WITH EVIDENCE WERE AGAINST THE
       MANIFEST WEIGHT AND SUFFICIENCY OF THE
       EVIDENCE.

III.    THE TRIAL COURT'S COMMENTS REGARDING THE
       CITIZENSHIP STATUS OF THE DECEDENT, FELIPE LOPEZ,
       WERE INDICATIVE OF JUDICIAL BIAS AND PREJUDICIAL
       TO THE APPELLANT.

IV.     THE TRIAL COURT ABUSED ITS DISCRETION IN
       ADMITTING IMPROPER HEARSAY EVIDENCE FROM THE
       STATEMENTS OF CO-DEFENDANTS RAYMOND LINKOUS
       AND THOMAS STEINHAUER.

V.      APPELLANT'S COUNSEL WAS INEFFECTIVE FOR FAILING
       TO FILE A MOTION TO SUPPRESS, FAILING TO REQUEST
       INDEPENDENT TESTING OF ALLEGED DNA EVIDENCE,
       FAILING TO REQUEST A CURATIVE INSTRUCTION ON
       HEARSAY, FAILING TO OBJECT TO IMPROPER OPINION
       TESTIMONY, FAILING TO OBJECT TO THE TRIAL
       COURT'S IMPROPER INSTRUCTION ON THE DECEDENT'S
       IMMIGRATION STATUS, FAILING TO OBJECT TO THE
       STATE OF OHIO PRESENTING AN ALTOGETHER
       DIFFERENT THEORY OF EVENTS THAN WHAT WAS
       DISCLOSED IN THEIR BILL OF PARTICULARS, AND
       FAILED TO CALL ANY WITNESSES ON BEHALF OF THE
       APPELLANT.

VI.    THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE OF OHIO'S MOTION IN LIMINE WHICH PREVENTED THE APPELLANT FROM APPROPRIATELY CROSS EXAMINING WITNESS STEVEN DRUMMOND.

VII.   APPELLANT WAS DENIED DUE PROCESS OF LAW AND THE RIGHT TO A FAIR TRIAL WHEN THE STATE OF OHIO SET FORWARD A THEORY OF PROSECUTION AT TRIAL THAT WAS INCONSISTENT WITH THE BILL OF PARTICULARS PREVIOUSLY FILED.

VIII.  CUMULATIVE ERRORS COMMITTED DURING APPELLANT'S TRIAL DEPRIVED HIM OF A FAIR TRIAL AND REQUIRE A REVERSAL OF HIS CONVICTIONS."

**FACTS**

{¶2} The record before us reveals that on March 7, 2012, Appellant, David Gerald, along with Thomas Steinhauer and Raymond "Jimmy" Linkous met Felipe Lopez at Lopez's house. Lopez informed his wife, Kelly Lopez, that he was going with Appellant, Steinhauer and Linkous to a friend's house in Otway. Instead of Otway, however, Lopez was found dead inside a pickup truck on Junior Furnace Powellsville Road, on the other side of the county, the same pickup truck he left his house in with Appellant, Steinhauer and Linkous. The record further indicates that it was determined Lopez was stabbed with a knife, struck in the head with a hatchet, and burned alive inside the pickup truck.

{¶3} After speaking with witnesses to the fire, it was quickly determined that Raymond Linkous was involved in Lopez' murder. After

speaking with Linkous and others, the investigation led law enforcement to suspect that Steinhauer and Appellant were also involved.  When law enforcement questioned Appellant, he initially denied any involvement; however, by the end of his interrogation, he had admitted he was with Lopez, Linkous and Steinhauer during the events which resulted in Lopez' death, that he saw Steinhauer stab Lopez multiple times, and that Linkous had set fire to the pickup truck with Lopez inside.  Appellant, however, denied contributing to Lopez' murder first-hand, and specifically denied striking Lopez in the head with a hatchet.  The knife, hatchet, as well as two cell phones belonging to the victim were eventually recovered and sent to the Bureau of Criminal Investigation (BCI) for testing.

{¶4} On March 26, 2012, the Scioto County Grand Jury returned an indictment that charged Appellant with (1) aggravated murder in violation of R.C. 2903.01(A); (2) aggravated murder in violation of R.C. 2903.01(B); (3) murder in violation of R.C. 2903.02(B); (4) aggravated arson in violation of R.C. 2909.02(A)(1); (5) arson in violation of R.C. 2909.03(A)(1); (6) three counts of tampering with evidence in violation of R.C. 2921.12(A)(1); (7) kidnapping in violation of R.C. 2905.01(A)(2); and (8) conspiracy to commit aggravated murder/murder in violation of R.C. 2923.01/2903.01 (A)(1)/ (A)(2)/ 2903.02(B).  Appellant denied the charges and on April 4, 2012,

filed a motion for a bill of particulars, and a motion to preserve evidence. The trial court granted the motion to preserve evidence and a bill of particulars was filed on May 1, 2012.

{¶5} Beginning on October 9, 2012, and continuing through October 11, 2012, the trial court held a jury trial. A few weeks prior to the beginning of trial, and after Appellant's co-defendant Raymond Linkous' trial had begun, the State informed the court that the hatchet and knife had been lost after the Bureau of Criminal Identification and Investigation (BCI & I) analyzed the items. Nevertheless, the State indicated that it intended to present testimony from the analyst who tested the hatchet and knife. As a result of the evidence being lost, on October 2, 2012, Appellant filed a motion to dismiss, or in the alternative, requested an order prohibiting the use of any and all testimony regarding the hatchet and knife. The trial court denied Appellant's motion and the matter proceeded to trial.

{¶6} At trial, the State presented the following evidence. On March 7, 2012, Lopez told his wife that he was going with Appellant, Steinhauer, and Linkous to Otway to meet a friend. The four left in a red Chevy S-10 pickup truck. Later that evening, witnesses observed a red or maroon Chevy S-10 pickup truck with one person inside and a white car, or silver PT Cruiser, with two people inside, parked along Junior Furnace Powellsville Road.

Shortly after 8:00 p.m., Jeff Huffman witnessed a vehicle being set on fire. He testified that he saw something light, then heard an explosion. As he approached, he testified that a PT Cruiser with one tail light out took off. He testified he tried to approach the truck but that he could not get close as "stuff started popping." Huffman returned to his house and called 911. The Green Township Fire Department responded to the call. Fire Chief, George Moore, testified that the fire originated inside the cab, was very intense and created a hazard to those around it. Then, when emergency personnel arrived, they discovered a body inside the truck's passenger compartment, was later determined to be Lopez. Law enforcement officials learned that the pickup truck contained Lopez's body, and quickly suspected Raymond Linkous' involvement due to prior experience with him driving the S-10 pickup truck[1] that was burned, as well as the silver PT Cruiser.

{¶7} When investigators arrived at Linkous' residence, they found a silver PT cruiser and verified that it did, indeed, have one tail light out. They also observed a burn pile on the property. They found Linkous exiting a trailer located in the rear of the property, in which Appellant resided. Linkous appeared to have just showered, shaved his head, and also had nicks that were bleeding, as well as singed eyebrows and burn marks on his face

---

[1] It was determined that the S-10 pickup truck was owned by Debra Conn. When investigators found Conn that evening, she initially reported the vehicle had been stolen, but then reported that Steinhauer had borrowed it and failed to return it.

and arms. Linkous was then taken into custody and transported to the Sheriff's Department for questioning. As a result of information gained from Linkous, investigators located Steinhauer, who handed investigators a bag of clothes and a knife upon their arrival. Steinhauer then led investigators to an area in Kentucky where Lopez's cell phones and a hatchet were recovered.

{¶8} When investigators spoke with Appellant, he blamed Steinhauer and Linkous for Lopez's murder. Appellant initially denied any knowledge of how the murder occurred, but then admitted to being present and witnessing Steinhauer stab Lopez and Linkous set fire to the truck. He further admitted to being in the truck with the group while they drove from Lopez's residence, through Kentucky, back into Ohio, stopped at a gas station and then went to Junior Furnace Powellsville Road. Appellant denied participation in the murder, but admitted that the group had planned to meet at Lopez's house because Steinhauer owed him money for drugs. Appellant specifically denied any knowledge of a hatchet and denied hitting Lopez with a hatchet.

{¶9} The State presented expert testimony at trial related to the DNA analysis that was performed on the evidence and the victim's cause of death. Dr. Bryan Casto, the deputy coroner and forensic pathologist who performed

the autopsy on Lopez testified that he identified multiple stab wounds, as if from a knife, and multiple chop wounds accompanied by crushing of the skull, as if from a hatchet. He further testified that Lopez suffered inhalation thermal injuries. Casto opined that the cause of death was multiple stab and chop wounds of the head and torso, contributed to by inhalation thermal injuries, which indicated Lopez was alive during the fire.

{¶10} Additionally, Raymond Peoples, a BCI & I forensic scientist testified regarding his performance of DNA analysis on both the knife and the hatchet. He testified that the DNA profile from the swab of the knife blade was a mixture, with a major profile consistent with that of the victim. He further testified that the DNA profile from the handle of the knife was a mixture of two individuals, the victim and Steinhauer. With regard to the hatchet, Peoples testified that the DNA profile from the swab of the blade was consistent with the victim, and that the handle included a mixture consistent with the victim, Appellant and Linkous. Thus, Appellant's DNA was present on the handle of the hatchet, despite Appellant having denied knowledge of a hatchet.

{¶11} Finally, the State presented the testimony of Steven Drummond, an individual who was in jail at the same time as Appellant. Drummond testified that he was bunkmates with Appellant at one point and

that during the time they were in jail together, Appellant stated, with respect to his pending charges, that "[h]e hit him in the back of the head with a hatchet." He also testified that at one point, Appellant referred to the action, stating that his head split open like a watermelon. Drummond further testified that Appellant told him that he and the others went to Lopez's house in a borrowed vehicle with a hatchet and a knife in an effort to scare him so he would not try to collect the money they owed him for drugs. Drummond testified that Appellant told him that they disarmed Lopez and hit him in the back of the head.

{¶12} On October 11, 2012, the jury found Appellant guilty of all charges. On October 18, 2012, the trial court sentenced Appellant to: (1) life without parole for the R.C. 2903.01(A) aggravated murder offense; (2) ten years for committing aggravated arson; (3) eighteen months for committing arson; (4) three years for each count of tampering with evidence in violation of R.C. 2921.12(A)(1); and (5) ten years for kidnapping. The court merged: (1) the R.C. 2903.01(B) aggravated murder, the R.C. 2903.02(B) murder, and the conspiracy to commit aggravated murder/murder offenses with the R.C. 2903.01(A) aggravated murder offense; and (2) the tampering with evidence offense involving the motor vehicle with the arson offense. The

court ordered the sentences to be served consecutively for a total sentence of life without parole plus twenty-nine years. This appeal followed.

## ASSIGNMENT OF ERROR I

{¶13} In his first assignment of error, Appellant contends that the trial court erred when it overruled his motion to dismiss and/or prevent the State from introducing evidence regarding the alleged murder weapons. Appellant argues that the State, in losing the knife and hatchet, failed to preserve evidence in accordance with the trial court's order filed on April 5, 2012, and, as a result, he was deprived of due process. He further argues that he was prevented from seeking independent DNA testing of the alleged murder weapons, a hatchet and a knife, because the State consumed the entire DNA sample prior to losing the weapons. The State responds by contending that Appellant has not demonstrated bad faith on the part of the State with respect to the loss of the evidence, and, as such, has not suffered a deprivation of due process.

{¶14} Appellant cites R.C. 2933.82 "Securing biological evidence" in support of his contention that the State had an obligation to preserve the DNA evidence on the murder weapons that were in the State's possession. There is no argument on appeal that the State had such an obligation. Further, Appellant points out that he filed a motion to preserve evidence on

April 4, 2012, which motion was granted by the trial court on April 5, 2012.

Again, the fact that the State was under a statutory obligation, as well as a

court ordered duty to preserve the biological evidence at issue herein is not

in dispute. The record reveals, however, that a knife and a hatchet, both

alleged murder weapons, were lost after DNA testing was performed by

BCI. Thus, based upon the following, the question at issue herein is whether

Appellant has demonstrated bad faith on the part of the State in failing to

preserve this evidence, which must be demonstrated in order to prove a

deprivation of due process.

{¶15} In *State v. Lupardus*, 4th Dist. Washington No. 08CA31, 2008-

Ohio-5960, ¶ 8, we stated as follows with respect to the standard of review

to be applied when reviewing a trial court's denial of a motion to dismiss on

the ground that the State failed to preserve evidence:

> " 'We review de novo a trial court's decision involving a motion
>
> to dismiss on the ground that the state failed to preserve
>
> exculpatory evidence.' (Cites omitted.) *State v. Sneed*,
>
> Lawrence App. No. 06CA18, 2007-Ohio-853, ¶ 19." But see,
>
> *State v. Fox*, 4th Dist. Ross No. 11CA3302, 2012-Ohio-4805,
>
> 985 N.E.2d 532, ¶ 22 (declining to follow the reasoning in
>
> *Lupardus* employing a de novo review and instead employing a

"hybrid standard of review that appellate courts apply to suppression motions and motions to dismiss on the basis of a violation of a defendant's speedy trial right[.]")[2]

Despite the apparent departure from this standard in *State v. Fox*, we continue to apply a de novo standard of review to a trial court's denial of a motion to dismiss on the ground that the State failed to preserve evidence.

{¶16} The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" To determine if a defendant's alleged due process rights are violated, courts characterize lost or destroyed evidence as (1) "materially exculpatory" or (2) "potentially useful." See, *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1. "The Due Process Clause protects a defendant from being convicted of a crime where the state has failed to preserve materially exculpatory evidence or has destroyed, in bad faith, potentially useful evidence." (Cite omitted.) *Sneed* at ¶20.

---

[2] *State v. Fox* involved the review of a trial court's decision regarding a motion to dismiss on the basis that the state failed to disclose materially exculpatory evidence. *Fox* at ¶22. The *Fox* court cited *Lupardus* in support of its departure from applying a de novo standard of review, characterizing the issue in *Lupardus* as one in which the state failed to produce exculpatory evidence. Id. However, *Lupardus* actually involved a situation where a dashboard tape from a dashboard cam was accidentally erased while trying to make a copy of it. *Lupardus* at ¶3. Thus, the issue in *Lupardus* was more appropriately characterized as a failure to preserve evidence, rather than a failure to produce evidence, which we believe is the appropriate characterization of the situation sub judice. As such, we apply a de novo standard of review in accordance with our prior reasoning in *Lupardus*.

**{¶17}** Here, Appellant has conceded that the evidence at issue is not materially exculpatory.  In his motion to dismiss that was filed on October 2, 2012, Appellant stated that the question of whether the lost evidence was materially exculpatory was not at issue.  Appellant instead argued that the evidence at issue was potentially useful and that the State had acted in bad faith by losing it in violation of a court order requiring it preserve the evidence.  However, "[u]nless a defendant can show that the state acted in bad faith, the state's failure to preserve potentially useful evidence does not violate a defendant's due process rights." *Geeslin*, supra, syllabus, following *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

**{¶18}** Appellant has equated the State's loss of the knife and hatchet to bad faith, essentially arguing it amounted to bad faith, per se, to lose the evidence when there was an order to preserve evidence. We reject this argument and instead find that the State's actions in losing the evidence did not rise to the level of bad faith, which has been defined as follows:

> " 'The term "bad faith" generally implies something more than
> bad judgment or negligence. "It imports a dishonest purpose,
> moral obliquity, conscious wrongdoing, breach of a known duty
> through some ulterior motive or [ill] will partaking of the nature

of fraud. It also embraces the actual intent to mislead or deceive

another." *State v. Buhrman* (Sept. 12, 1997), Greene App. No.

96 CA 145, unreported (citations omitted).' [*State v. Christian*

2nd Dist. Montgomery No. 17824, 1999 WL 1206651 (Dec. 17,

1999.]" *State v. Barron*, 2nd Dist. Greene No. 10CA28, 2011-

Ohio-2425, ¶ 17.

Aside from its contention that the mere act of losing the evidence constitutes

bad faith, Appellant has failed to demonstrate bad faith on the part of the

State.  In fact, the record reveals that this loss of evidence was simply

accidental, and there is nothing in the record to suggest otherwise.  For

instance, Paul Blaine, the officer in charge of the Sheriff's evidence room,

testified that in twelve years he had never lost a piece of evidence.

{¶19} Appellant further argues that he was deprived of due process

because he was unable to obtain independent testing of the DNA evidence

on the alleged murder weapons due to the State's consumption of the DNA

sample during its testing, which was conducted prior to the loss of the

weapons.  However, as pointed out by the State:

"The consumptive testing of evidence violates a defendant's due

process rights only when the evidence possesses an exculpatory

value that was apparent before the evidence was destroyed."

> *State v. Rios*, 2nd Dist. Clark No. 10CA0099, 2012-Ohio-3289,
>
> *3; citing *California v. Trombetta*, 467 U.S. 479, 488-489, 104
>
> S.Ct. 2528, 81 L.Ed.2d 413 (1984).

Further, as reasoned by the Eighth District Court of Appeals in *State v.*

*Abercrombie*, 8th Dist. Cuyahoga No. 88625, 2007-Ohio-5071, ¶ 23:

> "Unless a criminal defendant can show bad faith, the State's
>
> failure to preserve potentially useful evidence-of which no more
>
> can be said than that it could have been subjected to tests, the
>
> results of which might have exonerated the defendant-does not
>
> constitute a violation of the due process clause of the United
>
> States Constitution's Fourteenth Amendment. *Arizona v.*
>
> *Youngblood* (1988), 488 U.S. 51."

{¶20} Here, we have already determined that Appellant has not

demonstrated bad faith on the part of the State and that the State's accidental

loss of the evidence, despite the existence of a court order requiring it to

preserve the evidence at issue, does not rise to the level of bad faith. With

respect to the consumptive testing of the DNA evidence that was collected

prior to the loss of the knife and hatchet, the State's forensic scientist,

Raymond Peoples, testified that the DNA evidence collected from the knife

handle and hatchet handle was consumed during testing.  Mr. Peoples

testified at trial as follows:

> "Q.    * * * And then there are some listed at the end of your
>
> report under remarks, that say they were consumed
>
> during analysis.  What does that mean?
>
> A.    There are some samples -- usually when there is a body
>
> fluid, and a good amount of it, such as blood, a lot of
>
> times we don't need to consume the sample to do our
>
> testing, but there are times where in the process of testing
>
> we need to consume, whether it cutting -- using the
>
> whole outer layer or the swab.  So we list it in our report
>
> as consumed during analysis.
>
> Q.    Okay.  So if that's consumed we would not get an
>
> envelope back, is that correct?
>
> A.    No, you would not."

The trial transcript further reflects that the samples taken from the knife and

hatchet handles were consumed during analysis.  However, there is nothing

in the record to indicate any bad faith on the part of the State with respect to

the consumptive testing, but rather that consumption of the sample is

sometimes required during testing.

{¶21} Finally, Appellant cannot demonstrate that the evidence at issue possessed any exculpatory value prior to its loss.  As discussed above, Appellant has not argued that the evidence was materially exculpatory, but rather, that it was potentially useful.  Additionally, if anything, the evidence was inculpatory, as the testing performed by the State indicated the presence of Appellant's DNA on the hatchet, when Appellant claimed that he did not touch the hatchet.

{¶22} Based upon the foregoing, we find no merit to Appellant's first assignment of error and it is, therefore, overruled.

## ASSIGNMENT OF ERROR II

{¶23} In his second assignment of error, Appellant contends that all of his convictions, with the exception of his conviction for conspiracy to commit aggravated murder/murder, were against the manifest weight and sufficiency of the evidence.  Thus, we begin our analysis by considering the proper standards of review when faced with sufficiency and manifest weight challenges.

{¶24} " 'When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction.' " *State v. Leslie*, 4th Dist. Nos. 10CA17, 10CA18, 2011-Ohio-2727, ¶ 15; quoting

*State v. Puckett*, 191 Ohio App.3d 747, 2010-Ohio-6597, 947 N.E.2d 730, ¶

34 (4th Dist.). Thus, a conclusion that a conviction is supported by the

weight of the evidence will also determine the issue of sufficiency.[3] *Leslie*

at ¶ 15. Accordingly, we address whether Appellant's convictions are against

the manifest weight of the evidence.

{¶25} When considering whether a criminal conviction is against the

manifest weight of the evidence, an appellate court must review the entire

record, weigh the evidence and all reasonable inferences, and consider the

credibility of witnesses to determine "whether in resolving conflicts in the

evidence, the jury clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial

ordered." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854

N.E.2d 1038, ¶ 193.

{¶26} The reviewing court must bear in mind; however, that

credibility generally is an issue for the trier of fact to resolve. See *State v.*

*Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001). " 'If the prosecution

presented substantial evidence upon which the trier of fact reasonably could

conclude, beyond a reasonable doubt, that the essential elements of the

offense had been established, the judgment of conviction is not against the

---

[3] As we noted in *Leslie*, the inverse proposition is not always true.  For example, a conviction may pass a sufficiency analysis yet still fail to satisfy a manifest weight of the evidence challenge. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

manifest weight of the evidence.' " *State v. Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937, 964 N.E.2d 12, ¶ 43 (4th Dist.); quoting *Puckett* at ¶ 32. Thus, we will exercise our discretionary power to grant a new trial only in the exceptional case where the evidence weighs heavily against the conviction. *Drummond* at ¶ 193.

{¶27} Here, Appellant was convicted of ten felony offenses and he now raises sufficiency and manifest weight challenges to nine of the ten convictions.  Specifically, Appellant claims his convictions for two counts of aggravated murder, murder, aggravated arson, arson, three counts of tampering with evidence and kidnapping were based upon insufficient evidence and were against the manifest weight of the evidence.  He does not challenge his conviction for conspiracy to commit murder.

**Counts One, Two, Three, Four and Five:  Aggravated Murder, Aggravated Murder, Murder, Aggravated Arson, Arson**

{¶28} Appellant was charged and convicted of two counts of aggravated murder, murder, aggravated arson and arson and although he was indicted as a principal offender, the State pursued a complicity theory at trial.  R.C. 2903.01(A) and (B) set forth the essential elements of aggravated murder as charged in counts one and two of Appellant's indictment:

"(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, *aggravated arson*, *arson*, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape."[4]

(Emphasis added).

Here, the indictment with respect to count two, aggravated murder in violation of R.C. 2903.01(B), specified predicate offenses of aggravated arson and arson.

{¶29} Appellant was also charged and convicted of one count of murder. R.C. 2903.02 (B) sets forth the essential elements of murder as charged in count three of Appellant's indictment:

---

[4] R.C. 2901.22(A) provides as follows: "A person acts purposefully when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature".

"(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

Here, the predicate offenses for the murder charge, as specified in the indictment, were "Felonious Assault and/or Aggravated Arson or Arson[.]"

{¶30} Appellant was also charged and convicted of one count of aggravated arson and one count of arson. R.C. 2909.02(A)(1) sets forth the essential elements of aggravated arson, as charged in count four of Appellant's indictment:

"(A) No person, by means of fire or explosion, shall knowingly do any of the following:

(1) Create a substantial risk of serious physical harm to any person other than the offender[.]"

R.C. 2909.03(A)(1) sets forth the essential elements of arson, as charged in count five of Appellant's indictment:

"(A) No person, by means of fire or explosion, shall knowingly do any of the following:

(1) Cause, or create a substantial risk of, physical harm to any property of another without the other person's consent[.]"

{¶31} The State's theory at trial was that Appellant and two others, Raymond Linkous and Thomas Steinhauer, aided and abetted and conspired with one another in murdering the victim, Felipe Lopez. Thus, although Appellant was charged with the principal offenses of aggravated murder, murder, aggravated arson and arson, the State's theory at trial was one of complicity and the jury was instructed accordingly.

{¶32} Under R.C. 2923.03(F), a defendant "may be convicted of [an] offense upon proof that he was complicit in its commission, even though the indictment 'is stated * * * in terms of the principal offense' and does not mention complicity." *State v. Herring*, 94 Ohio St.3d 246, 251, 762 N.E.2d 940 (2002). R.C. 2923.03 defines complicity and provides, in relevant part, as follows:

"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * *

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of

section 2923.01 of the Revised Code."[5]

In order to support a conviction for complicity by aiding and abetting

pursuant to R.C. 2923.03(A)(2), it has been held that the evidence must

show that the defendant supported, assisted, encouraged, cooperated with,

advised, or incited the principal in the commission of the crime, and that the

defendant shared the criminal intent of the principal. *State v. Johnson*, 93

Ohio St.3d 240, 245, 754 N.E.2d 796 (2001), syllabus. The defendant's

intent may be inferred from the circumstances surrounding the crime. Id.;

see also *State v. Markins*, 4th Dist. Scioto No. 10CA3387, 2013-Ohio-602,

¶32. Further, the defendant's " '[p]articipation in criminal intent may be

inferred from presence, companionship and conduct before and after the

offense is committed.' " *Johnson* at 245; quoting *State v. Pruett*, 28 Ohio

App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971); see also *Markins* at ¶33.

{¶33} As such, we must consider the circumstances surrounding the

victim's death as well as Appellant's presence, companionship and conduct

before and after the victim's death to determine whether Appellant

supported, assisted, encouraged, cooperated with, or advised the principals,

in this case Steinhauer and Linkous, in the aggravated murder and murder of

---

[5] R.C. 2923.01 governs conspiracy to commit aggravated murder/murder, of which Appellant was convicted in count ten of his indictment. Appellant does not challenge his conspiracy conviction on appeal.

the victim, as well as the aggravated arson and arson that served as the predicate offenses, if we are to conclude Appellant was complicit under (A)(2) of the complicity statute. We further note, however, that section (A)(3) of the complicity statute provides that complicity may be proven by demonstrating that Appellant conspired with the others to commit the offenses, in violation of section 2923.01 of the Revised Code.

{¶34} R.C. 2923.01 governs conspiracy, and in this case, conspiracy to commit aggravated murder and murder, per count ten of Appellant's indictment. Appellant was indicted and convicted of conspiracy to commit aggravated murder and murder and he does not challenge that conviction on appeal. Thus, he has conceded that he conspired to commit the crimes of aggravated murder and murder, and implicit in that concession, aggravated arson and arson, by virtue of the fact that those were the predicate offenses for the aggravated murder and murder charges for which Appellant has conceded he conspired to commit. Thus, by conceding his conspiracy conviction, he has also conceded to the (A)(3) prong of the complicity statute. Having conceded to being complicit in these crimes, Appellant cannot now complain of being convicted as a principal offender of the crimes of aggravated murder, murder, aggravated arson and arson.

**{¶35}** However, assuming Appellant has not waived his right to challenge these convictions based upon sufficiency and manifest weight grounds, we nevertheless conclude there was ample evidence to support a verdict that Appellant was complicit in the killing of Felipe Lopez and that Appellant purposefully, and with prior calculation and design, caused the death of Felipe Lopez, and also that Appellant was complicit in purposefully causing Felipe Lopez' death while committing or attempting to commit aggravated arson and arson. By Appellant's own admissions during his interrogation and through the testimony of Steven Drummond, Appellant was in the truck with Lopez, Steinhauer and Linkous, with weapons, for the purpose of at least intimidating Lopez, and which ultimately resulted in Lopez being stabbed, struck with a hatchet and burned alive. Additionally, the State introduced evidence that the truck was destroyed, which was owned by Debra Conn, and that in trying to put the fire out, several people were put at risk, including Jeff Huffman and the fire department personnel who responded to the blaze.

**{¶36}** During his interrogation, Appellant admitted his presence 1) during the stabbing; 2) during the trip to Kentucky to dispose of evidence; 3) during the stop at the gas station; 4) and during the burning of the victim and the truck. Further, although Appellant denied that he struck the victim with

a hatchet and denied knowledge of a hatchet, Drummond's testimony contradicted Appellant's denial, and the evidence at trial indicated that Appellant's DNA was present on the handle of the hatchet, which confirmed the State's theory. Finally, after the commission of the crime, Linkous was found exiting Gerald's residence, where it was obvious Linkous had showered and shaved his singed hair.

{¶37} In light of the foregoing, we find there was substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offenses of aggravated murder, murder, aggravated arson and arson had been established, and that Appellant and the others were in complicity by virtue of their presence, cooperation, companionship and conduct both before and after the victim's death. As such, the judgments of conviction on counts one, two, three, four and five are not against the manifest weight of the evidence. Further, as set forth above, this conclusion necessarily means sufficient evidence supports his convictions.

## Counts Six, Seven and Eight:

{¶38} Appellant was charged and convicted of three counts of tampering with evidence. R.C. 2929.12 (A)(1) sets forth the essential

elements of tampering with evidence as charged in counts six, seven and eight of Appellant's indictment:

"(A)   No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1)     Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶39} Appellant was convicted of three counts of tampering with evidence based upon the State's allegations that he 1) destroyed clothing and other personal items, with purpose to impair their availability as evidence; 2) destroyed and concealed cell phones, a knife and a hatchet, with purpose to impair their availability as evidence; and 3) destroyed a motor vehicle, with purpose to impair its availability as evidence.

{¶40} The State presented evidence at trial that Appellant conspired with Linkous and Steinhauer in the commission of the aggravated murder of Lopez.  The record contains evidence that Appellant was present and cooperated with those individuals in killing Lopez, driving to Kentucky, where the murder weapons and the victim's cell phones were destroyed and concealed and ultimately recovered, and then driving back to Ohio, stopping

at a gas station and then meeting at a location on Junior-Furnace Powellsville Road, where the truck containing Lopez' severely injured body was set on fire and destroyed. Appellant admitted to being present during the trip to Kentucky where the items were disposed of, and based upon his conduct and the facts in evidence we can infer his participation in the destruction and concealment of that evidence. Further, despite Appellant's denial in the participation of setting the truck on fire, we can infer from his conduct his support, assistance and cooperation in setting the fire.

{¶41} Finally, although Appellant denied that he destroyed the clothing he wore during the commission of the crimes, the presence of a burn pile at the Gerald and Linkous' residence and the fact that their clothing was never recovered supports an inference that they burned their clothes. This is bolstered by the fact that both Gerald and Linkous appeared to have just showered when law enforcement encountered them and Linkous had shaved his hair and had singe marks on his body. Further, Steinhauer, who was found in a different location, one without a burn pile, had bagged his blood-saturated clothes up and handed them to law enforcement when they arrived. Appellant's clothes were never recovered and we conclude that evidence supports an inference that they were burned in the burn pile.

**{¶42}** At the time Appellant would have tampered with evidence, an official proceeding or investigation was not yet in progress; however, " '[w]hen an offender commits an unmistakable crime, the offender has constructive knowledge of an impending investigation of the crime committed.' " *State v. Nguyen*, 4th Dist. Athens No. 12CA14, 2013-Ohio-3170, ¶ 89; quoting *State v. Schmitz*, 10th Dist. No. 05AP-200, 2005-Ohio-6617, ¶ 17. Further, with respect to the element of the offense requiring purpose to impair the value or availability of the evidence in such a proceeding or investigation, "the offender does not have to actually impair the evidence's value or availability. It is sufficient that the offender alters, destroys, conceals, or removes the item 'with purpose' to impair its value or availability." Id. at ¶ 91. Thus, it makes no difference that the cell phones and murder weapons were ultimately recovered.

**{¶43}** Here, the jury could logically conclude that the essential elements of tampering with evidence were proven with respect to counts six, seven and eight of Appellant's indictment. As such, Appellant's convictions are not against the manifest weight of the evidence. As set forth above, this conclusion necessarily means sufficient evidence supports his convictions. Accordingly, Appellant's sixth, seventh and eighth assignments of error are without merit and are, therefore, overruled.

## Count Nine:  Kidnapping

{¶44} Appellant was charged and convicted of one count of kidnapping. R.C. 2905.01 (A)(2) sets forth the essential elements of kidnapping as charged in count nine of Appellant's indictment:

"(A)   No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2)    To facilitate the commission of any felony or flight thereafter[.]"

{¶45} Appellant contends that the evidence at trial indicates that he left Lopez's house in the bed of the truck and remained in the bed of the truck throughout the ordeal.  He further argues that Lopez entered the truck voluntarily and that there was no evidence introduced that Lopez was forced into the truck or that his liberty was restrained after he entered the truck. The State contended at trial, and also on appeal, that Appellant and his co-defendants attacked Lopez at some point after they all left in the truck and then restrained Lopez's movement thereafter by transporting him over forty

five miles to the location in which he was burned, unbeknownst to them, alive.

{¶46} In *State v. Linkous*, 4th Dist. No. 12CA3517, 2013-Ohio-5853, a decision issued by this Court in connection with the appeal of one of Appellant's co-defendants, we reasoned as follows at ¶ 37 with respect to the same argument related to the kidnapping conviction:

"In *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6405, 858 N.E.2d 1144 (2006), the Ohio Supreme Court held that sufficient evidence supported a defendant's kidnapping conviction, even though the defendant mistakenly believed the victim was dead before he 'gagged and hogtied the victim' and concealed the victim's body in the basement. In *Johnson*, the defendant was charged with aggravated murder and kidnapping of a thirteen-year old child. On appeal, he asserted that sufficient evidence did not support his kidnapping conviction because the evidence showed the he 'beat [the victim] to death' in the living room before he restrained the victim and moved his body to the basement. Id. at ¶ 11, 942 N.E.2d 1061. The defendant argued 'that he could not have kidnapped [the victim], because [the victim] died before [the defendant]

hogtied him.' Id. at ¶ 40, 942 N.E.2d 1061. In rejecting the defendant's argument, the court explained: ' * * * [T]he evidence does not support [the defendant's] contention that [the victim] had died before being restrained. [The coroner] testified that [the victim] was still alive when [the defendant] tied his hands and feet, and this testimony supports the jury's finding that [the defendant] restrained [the victim] of his liberty.' Id. at ¶ 41, 942 N.E.2d 1061."

{¶47} We determined that the facts in *Linkous* involved facts similar to *Johnson* in that the evidence indicated that the victim was not dead when the appellant and his accomplices restrained him. Id. at ¶ 38. Based upon those facts, we determined in *Linkous* that "the evidence support[ed] the jury's finding that appellant and his accomplices restrained the victim's liberty." Id. We find the reasoning employed in both *Johnson* and *Linkous* to be applicable here where the State presented expert testimony that even though Lopez had sustained severe stab and chop wounds, he was still alive during the fire. Thus, we conclude the evidence supports the jury's finding that Appellant and his accomplices restrained the victim's liberty. Again, even if Appellant was not driving the truck and even if Appellant did not light the match, we have sustained his convictions for aggravated murder,

murder and aggravated arson under a theory of complicity. As such, we also conclude that his conviction for kidnapping is not against the manifest of the evidence and is supported by sufficient evidence.

{¶48} Having found no merit to these sufficiency and manifest weight arguments, Appellant's second assignment is overruled.

## ASSIGNMENT OF ERROR III

{¶49} In his third assignment of error, Appellant contends that the trial court's comments regarding the citizenship status of the victim, Felipe Lopez, were indicative of judicial bias. Appellant contends that a statement made, or rather, a curative instruction given, by the trial court to the jury was prejudicial. The State responds by acknowledging the statement made by the trial court, but contends that it did not rise to the level of judicial bias, and did not prejudice Appellant, especially in light of a further curative instruction given to the jury prior to deliberations.

{¶50} A review of the record indicates that Appellant's counsel attempted to cross-examine Detective Conkel regarding the citizenship status of the victim, Felipe Lopez. When counsel inquired as to the expiration of the victim's work visa, an objection was made and a bench conference was held. After discussion with counsel, the trial court stated, outside the presence of the jury, that "his citizenship status does not matter.

It is no relevance to this case." The objection was then sustained and the

court stated as follows to the jury: "I'm going to instruct the jury at this time

that citizenship status has no bearing on this case. I don't know whether

he's a citizen or not, but everybody has a right to live. Okay." Appellant

argues that this statement was not only prejudicial, but was an incorrect

statement of the law, as Ohio law recognizes the doctrine of self-defense and

defense of others. Appellant further argues that comments made by the trial

court at Appellant's eventual sentencing hearing indicating that this was the

"most heinous crime" it had seen were prejudicial and indicative of bias.

{¶51} As this Court recently observed:

" 'Judicial bias has been described as "a hostile feeling or

spirit of ill will or undue friendship or favoritism toward one of

the litigants or his attorney, with the formation of a fixed

anticipatory judgment on the part of the judge, as

contradistinguished from an open state of mind which will be

governed by the law and the facts." *State ex rel. Pratt v.*

*Weygandt* (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d

191, paragraph four of the syllabus.

In *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147,

127 L.Ed.2d 474 (1994), the Supreme Court held that "opinions

formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." On the other hand, "[t]hey may do so [support a bias challenge] if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphasis sic.) Id.' " *Culp v. Olukoga*, 3 N.E.3d 724, 2013-Ohio-5211, ¶ 55; quoting *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶¶ 47-48.

Further, as we noted in *Culp* at ¶ 55:

" 'A trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity. *Corradi v. Emmco Corp.* (Feb. 15, 1996), Cuyahoga App. No. 67407, unreported,

1996 WL 65822 [at 3] citing *State v. Wagner* (1992), 80 Ohio App.3d 88, 93, 608 N.E.2d 852; citing State v. Richard (Dec. 5, 1991), 1991 WL 261331, Cuyahoga App. No. 61524.  Bias against a party is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party. *In re Adoption of Reams* (1989), 52 Ohio App.3d 52, 59, 557 N.E.2d 159.'  *Frank Novak & Sons, Inc. v. Brantley, Inc.*, 8th Dist. Cuyahoga No. 77823, 2001 WL 303716 (Mar. 29, 2001)[.]"

**{¶52}** Here, a review of the trial transcript does not indicate that the trial judge displayed any "deep-seated favoritism or antagonism that would make fair judgment impossible." Although the trial court judge may have gone, as Appellant argues, a step too far, in making the statement that everyone deserves to live, we cannot find that this remark supports a bias or partiality challenge.  Further, we reject Appellant's suggestion that such a statement is contrary to a claim of self-defense or defense of others. Additionally, as pointed out by the State, the trial court provided a limiting instruction to the jury prior to deliberations as follows:

"If, during the course of the trial, I said or did anything which you consider an indication of my view on the facts, you are

instructed to disregard it.  The Judge must be, and sincerely

desires to be, impartial in presiding over this and every other

trial before a jury and without a jury.  The Court does not have

the right and does not desire to invade the province of the jury

by indicating in any way a preference between the State and the

{¶53} Defendant and the Court has not done so at any time."

Courts have long held that juries are presumed to follow limiting, or

curative, instructions. See e.g. *State v. Martin,* 4th Dist. Scioto No.

04CA2946, 2005-Ohio-4059, ¶ 17; *State v. Wasmer*, 4th Dist. Jackson No.

714, 1994 WL 90400 (Mar. 16, 1994).

{¶54} Further, we find no merit to Appellant's argument that the trial

court's statements at sentencing were prejudicial.  A review of the record

indicates that this statement made by the trial court was made after the jury

had already rendered its decision.  Thus, it could not have influenced the

jury.  R.C. 2929.11(A) requires that the trial court, in imposing sentence, be

guided by the overriding principles and purposes of felony sentencing,

which include the need to protect the public from future crime by the

offender, and also to punish the offender.  Further, 2929.12 requires the trial

court to consider certain factors in imposing sentences for felony offenses.

These factors include the seriousness of the offender's conduct, the danger

posed to the public, and the degree of harm caused. We find that the statement by the trial court with respect to the seriousness of the offense was consistent with the court's duties under the felony sentencing statutes and in no way reflects judicial bias.

{¶55} Finally, R.C. 2701.03 provides the exclusive means by which a litigant can assert that a common pleas judge is biased or prejudiced.[6] *Jones v. Billingham*, 105 Ohio App.3d 8, 11, 663 N.E.2d 657 (1995). Consequently, a court of appeals lacks "authority to pass upon disqualification or to void the judgment of the trial court upon that basis." *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442 377 N.E.2d 775 (1978). As we noted in *In re Adoption of C.M.H*, 4th Dist. Hocking No. 07CA23, 2008-Ohio-1694 *and Hirzel v.Ooten*, 4th Dist. Meigs Nos. 06CA10, 07CA13, 2008-Ohio-7006, ¶ 63, "challenges of judicial prejudice and bias are not properly brought before this Court. Rather, appellant must make such a challenge under the provisions of R.C. 2701.03, which requires an affidavit of prejudice to be filed with the Supreme Court of Ohio.' " Quoting *Baker v. Ohio Dept. of Rehab. and Corr.*, 144 Ohio App.3d 740, 754, 761 N.E.2d 667 (4th Dist.2001). Furthermore, 'any allegations of judicial misconduct are not

---

[6] R.C. 2701.03(A) provides: "If a judge of the court of common pleas allegedly is interested in a proceeding pending before the court, allegedly is related to or has a bias or prejudice for or against a party to a proceeding pending before the court or a party's counsel, or allegedly otherwise is disqualified to preside in a proceeding pending before the court, any party to the proceeding or the party's counsel may file an affidavit of disqualification with the clerk of the supreme court in accordance with division (B) of this section."

cognizable on appeal, but [are] a matter properly within the jurisdiction of the Disciplinary Counsel.' " *Wilburn v. Wilburn*, 169 Ohio App.3d 415, 421, 2006-Ohio-5820, 863 N.E.2d 204, ¶ 10 (9th Dist.); quoting *Szerlip v. Spencer*, 5th Dist. No. 01CA30, 2002 WL 433442 (Mar. 14, 2002).

{¶56} Based upon the foregoing, we find no merit to Appellant's third assignment of error and it is, therefore, overruled.

## ASSIGNMENT OF ERROR IV

{¶57} In his fourth assignment of error, Appellant contends that the trial court abused its discretion in admitting improper hearsay evidence in the form of statements of co-defendants Raymond Linkous and Thomas Steinhauer. More specifically, Appellant contends that the trial court erred by allowing Detective Conkel to repeat incriminating statements made by his co-defendants as part of her interrogation of him during the investigation of Felipe Lopez's death. Appellant further argues that the trial court failed to give the jury an instruction that they could not consider Detective Conkel's statements for the truth of the matter asserted. A review of the record indicates that Appellant's counsel objected to the State's attempt to use this videotaped interview at trial on constitutional grounds, claiming that statements contained in the video violated the confrontation clause.

{¶58} In response, the State argues that the statements made by Detective Conkel were not hearsay, as they were not offered to prove the truth of the matter asserted. The State further argues that the record indicates that some of the statements made by Conkel during the interrogation were false, and were designed to elicit a response from Appellant. The State also points out that the trial court did, in fact, provide a lengthy instruction to the jury, which instructed them that the State was not offering the officer's statements to prove the truth of the matter asserted.

{¶59} "[T]he admission or exclusion of evidence generally rests in the trial court's sound discretion." *State v. Jeffers*, 4th Dist. No. 08CA7, 2009-Ohio-1672, ¶ 17; citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). "However, questions concerning evidentiary issues that also involve constitutional protections, including confrontation clause issues, should be reviewed de novo." *Jeffers* at ¶ 17; citing *State v. Hardison*, 9th Dist. Summit No. 23050, 2007-Ohio-366.

{¶60} The Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The Supreme Court of the United States has "held that this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36,

42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); citing *Pointer v. Texas*, 380

U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Likewise, Section 10,

Article I of the Ohio Constitution provides, "[i]n any trial, in any court, the

party accused shall be allowed * * * to meet the witnesses face to face."

Before its admission, "[w]here testimonial evidence is at issue * * * the

Sixth Amendment demands what the common law required: unavailability

and a prior opportunity for cross examination." *Crawford*, 541 U.S. at 68.

{¶61} The threshold inquiry is whether the challenged out-of-court

statements were testimonial in nature and needed to be tested by

confrontation. See *State v. Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-

060010, 2007-Ohio-1485, ¶ 30. Statements are "testimonial when the

circumstances objectively indicate that there is no * * * ongoing emergency,

and that the primary purpose of the interrogation is to establish or prove past

events potentially relevant to later prosecution." *Davis v. Washington*, 547

U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); see also *State v.*

*Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one

of the syllabus.  Here, there was no ongoing emergency, but rather, the

circumstances indicate that the purpose of the interrogation was to prove

past events relevant for later prosecution.  As such, we find the statements at

issue to be testimonial.

{¶62} Confrontation Clause violations, however, are subject to harmless error analysis. See *State v. Kraft*, 1st Dist. Hamilton No. C-060238, 2007-Ohio-2247, ¶ 67; citing *United States v. Summers*, 414 F.3d 1287, 1303 (10th Cir.2005). "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78; citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, the question of whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. *Conway* at ¶ 78. Rather, it is a question of whether there is a reasonably possibility that the evidence complained of might have contributed to the convictions. Id.; citing *Chapman* at 23.

{¶63} Hearsay is defined as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible at trial, unless it falls under an exception to the Rules of Evidence. Evid.R. 802. Evid.R. 801(D)(2)(a) provides that a statement is "not hearsay" if, "The statement is offered against a party and is * * * the party's own statement * * *." The statements at issue herein are not Appellant's own statements, but rather are statements purportedly made by Appellant's co-

defendants to law enforcement during the investigation of the homicide of Felipe Lopez.

{¶64} Appellant does not cite to the specific statements made by Conkel, but rather refers to a span of nearly fifty pages in the trial transcript in which he argues these statements are contained. As Appellant does not set forth and argue each statement separately, neither do we. However, after reviewing the transcript we identified several statements by Conkel that incorporate statements purportedly made by Linkous and Steinhauer. Implicit in the State's argument that some of the statements weren't even actually made by the co-defendants, is the fact that some of them ostensibly were. Assuming that any of these statements were, in fact, made by the co-defendants, we find that the trial court should not have allowed into evidence the portions of the tape where Detective Conkel stated that Appellant's co-defendants implicated him in the crimes.

{¶65} Prior to interrogating Appellant, it appears that Detective Conkel interviewed Appellant's co-defendants, Linkous and Steinhauer, about Felipe Lopez's death. During Appellant's recorded interview, Detective Conkel made multiple references to statements made by Appellant's co-defendants indicating Appellant was involved in the crimes, specifically suggesting that Linkous and Steinhauer said Appellant struck the

victim with a hatchet. Neither Linkous nor Steinhauer testified at Appellant's trial and thus were not subject to cross-examination. As such, these testimonial statements are barred by the Confrontation Clause and their admission violated Appellant's Sixth Amendment rights. See *Crawford* and *Davis*, supra. Although the trial court did provide a limiting instruction to the jury informing the jury that Conkel's statements were not to be considered as evidence, were not offered to prove the truth of the matter asserted, and were simply designed to elicit responses from Appellant, we find that this instruction was insufficient to cure this constitutional violation.

**{¶66}** It has been observed that "[m]ost testimonial statements are too damaging for a lay juror to separate and/or ignore." *State v. Edwards*, 11th Dist. Lake No. 2012-L-034, 2013-Ohio-1290, ¶ 38; citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). " 'The rationale of *Bruton* was that the introduction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment.' " *Edwards* at ¶ 38; quoting *United States v. Fleming*, 594 F.2d 598, 602 (7th Cir.1979). The *Bruton* rule also applies to statements of co-defendants that are not confessions. *State v. Moritz*, 63 Ohio St.2d 150, 155, 407 N.E.2d 1268 (1980).

{¶67} However, "[c]ases following *Bruton* have established that the error may be harmless." Edwards at ¶39 (internal citation omitted). As such, *Bruton* violations are subject to harmless error review. See *State v. Burney*, 10th Dist. No. 06AP-990, 2007-Ohio-7137, ¶53; citing *Harrington v. California*, 395 U.S. 250, 252–254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

> " 'The mere finding of a violation of the *Bruton* rule in the course of the trial * * * does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission [or statements] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error. (* * *)' " *Moritz* at 156; citing *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

{¶68} Based on the facts of this case, the limiting instruction alone was not enough to cure the *Bruton* violation because the jury had already heard the testimonial statements of Detective Conkel that Appellant's co-defendants had implicated Appellant in the crimes resulting in the death of Felipe Lopez. Although such testimonial statements may have been too

damaging for a lay juror to separate and/or ignore, we are mindful that *Bruton* violations are sometimes harmless error. Here, we conclude the *Bruton* violation was harmless error and did not prejudice Appellant as there was overwhelming evidence of his guilt. As set forth above, we have already determined that Appellant's convictions were not against the manifest weight of the evidence and were supported by sufficient evidence. We further note that in reaching that decision, we were careful to only consider evidence properly admitted at trial, and did not consider the statements complained of under this assignment of error. Thus, the trial court's error was harmless beyond a reasonable doubt.

{¶69} Finally, we address Appellant's argument that Detective Conkel was improperly permitted to testify generally about the results of her investigation. Appellant contends that Detective Conkel repeatedly used the phrase "during the course of my investigation" and "through my investigation" as a means of introducing hearsay. Initially we note that Appellant did not object to this general testimony by Conkel during trial. Thus, it must be reviewed under a plain error analysis. "To constitute plain error, a reviewing court must find (1) an error in the proceedings, (2) the error must be a plain, obvious or clear defect in the trial proceedings, and (3) the error must have affected 'substantial rights' (i.e., the trial court's error

must have affected the trial's outcome)." *State v. Dickess*, 174 Ohio App.3d 658, 2008-Ohio-39, 884 N.E.2d 92, ¶ 31 (4th Dist.); citing *State v. Hill*, 92 Ohio St.3d 191, 749 N.E.2d 274 (2001); and *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "Furthermore, notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." Id.; citing *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990); and *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "A reviewing court should notice plain error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

{¶70} A review of the record reveals that prior to the interview tape being played for the jury, Conkel was asked to recite a summary of the results of her investigation. After reviewing the transcript, it appears Conkel's testimony served to illustrate and explain the steps taken during the course of her investigation, leading up to the point in which Appellant was interrogated. There were a few times during that recitation that Conkel began to include statements by Appellant's co-defendants, however, objections were promptly made and Conkel was re-directed in giving her testimony. "[I]t is well-settled that statements offered by police officers to

explain their conduct while investigating a crime are not hearsay because they are not offered for their truth, but rather, are offered as an explanation of the process of investigation." *State v. Spires*, 4th Dist. Gallia No. 10CA10, 2011-Ohio-3661, ¶ 13; quoting *State v. Warren*, 8th Dist. Cuyahoga No. 83823, 2004-Ohio-5599 at ¶ 46; citing *State v. Price*, 80 Ohio App.3d 108, 110, 608 N.E.2d 1088 (1992); *State v. Braxton*, 102 Ohio App.3d 28, 49, 656 N.E.2d 970 (1995); *State v. Blevins*, 36 Ohio App.3d 147, 149, 521 N.E.2d 1105 (1987). Thus, we find no error, let alone plain error, related to the admission of these statements.

{¶71} Having found no merit to any of the arguments raised under Appellant's fourth assignment of error, it is overruled.

## ASSIGNMENT OF ERROR V

{¶72} In his fifth assignment of error, Appellant contends that his counsel was ineffective for failing to file a motion to suppress, failing to request independent DNA testing, failing to request a curative instruction on hearsay, failing to object to improper opinion testimony, failing to object to the trial court's improper instruction on the victim's immigration status, failing to object to the State presenting an altogether different theory of events that what was disclosed in their bill of particulars, and failing to call any witnesses on his behalf.

**{¶73}** To prevail on an ineffective assistance of counsel claim, an appellant must show 1.) counsel's performance was deficient and 2.) the deficient performance prejudiced the defense so as to deprive the accused of a fair trial. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶205; citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, an appellant must show that counsel's performance fell below an objective level of reasonable representation. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶95. To establish prejudice, an appellant must show a reasonable probability exists that, but for the alleged errors, the result of the proceeding would have been different. Id. "A defendant's failure to establish one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶74}** In reviewing the claim of ineffective assistance of counsel, we are admonished to indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689.

FAILURE TO FILE A MOTION TO SUPPRESS

**{¶75}** Appellant contends that trial counsel was ineffective for failing to file a motion to suppress. Specifically, Appellant argues that he clearly invoked his right to counsel on two back-to-back occasions while being interrogated by Detective Conkel. The State responds by arguing that a motion to suppress would have been meritless as Appellant continued talking to Detective Conkel after saying that he wanted a lawyer.

**{¶76}** We initially note that the failure to file a motion to suppress does not constitute per se ineffective assistance of counsel. *State v. Madrigal* at 389. Rather, the failure to file a motion to suppress amounts to ineffective assistance of counsel only when the record demonstrates that the motion would have been successful if made. *State v. Walters*, 4th Dist. Adams No. 12CA949, 2013-Ohio-772, ¶20; citing *State v. Resendiz*, 12th Dist. No. CA2009-04-012, 2009-Ohio-6177, ¶29; citing, *State v. Brown*, 12th Dist. Warren No. CA2002-03-026, 2002-Ohio-5455, ¶11. According to *Resendiz*, we are to presume that trial counsel was effective if he could have reasonably decided that filing a suppression motion would be a futile act, even if there is some evidence in the record to support a motion. *Resendiz* at ¶ 29.

**{¶77}** Thus, this Court must review the record to determine whether a motion to suppress, if filed, would have been successful. The trial transcript

includes a transcription of Appellant's interview video that was played for

the jury. The interview begins with Detective Conkel informing Appellant

that she had already spoken with Linkous and Steinhauer, had been informed

that the victim's cell phones and a hatchet had been recovered, and that there

was a video of Appellant and the others getting gas at Kroger. It was after

Conkel next represented to Appellant that Steinhauer had admitted to

stabbing the victim, and then suggested that Appellant was in the truck, and

had hit the victim in the head with a hatchet, that Appellant made his first

mention of desiring an attorney. The transcript indicates that during

Appellant's interrogation, the following exchange took place between

Appellant and Detective Conkel:

> "Conkel:      Tell me what happened. There's four people in
> this vehicle. Okay. You're one of them.
>
> Defendant:   I want a lawyer.
>
> Conkel:      Okay. That's your choice.
>
> Defendant:   I want a lawyer because I don't feel like anybody's
> going to go to bat for me at all. You guys are just
> going to charge me with some murder that I didn't
> do.
>
> Conkel:      Okay.
>
> Defendant:   And lock me up and throw away the key. I mean, I
> understand –

Conkel:     Okay.  You want an attorney, so we're going to give you a chance to get an attorney.

Defendant:  Well, I'm just saying I understand how you guys do things.  You know, you're saying I'm guilty, but I'm not.

Conkel:     Well, I'm going to tell – what I'm going to tell you is we've got eyewitnesses who can place you out on 104, who can place you at the place where it was burnt, and place you where the gas was bought.  Okay, I'm just –

Defendant:  But I didn't buy gas.  I bought cigarettes.

Conkel:     Right.  Jimmy paid for the gas.  I know that.  Like said, you want an attorney.  We'll take you over to jail.  I'll tell you what you'll be charged with tonight.  It looks like it will be aggravated murder –

Defendant:  Jesus Christ, you're kidding me?

Conkel:     It'll be tampering with evidence.

Defendant:  Tampering with evidence?

Conkel:     Abuse of a corpse.

Defendant:  What do you mean abuse of a corpse?

Conkel:     Those are all charges involved in the crimes that were done tonight.

Defendant:  But I didn't do none of those things.

Conkel:     Like I said, you – do you want to talk to me without an attorney or do you want an attorney, because I can hear your side of the story, but that's

only if you want to talk to me.  That's totally up to you.

Defendant:    But my side of the story – you're going to hang me out to dry.

Conkel:    Honey, I'm not hanging you out to dry.

Defendant:    I don't understand.

Conkel:    I wasn't there.  I didn't do this.  I didn't see anything.  I'm just telling you what the evidence says, and I'm just telling you what we've got.  What we've seen.  We've got people who places you where the – where the vehicle was on fire, which I already know Jimmy set it on fire.  Jimmy's the one who set it on fire.  He's admitted to that.  Lit a rag, threw it in the truck.  He's – he's taking the blame for that.  Okay.  I've got witnesses placing you there,  I've got you at Kroger's, and I've got witnesses drove by that seen you on 104 where the incidents were taking place.

Defendant:    I didn't kill the man.

Conkel:    Its up to you – do you—do you want to continue – do you want to talk to me without an attorney or do you want me to take you on over?  That's your choice, because you told me you wanted an attorney, so I have to ask you.

Defendant:    Him and Thomas got into a fight in the truck and he stabbed the living shit out of him."

{¶78} When dealing with a claim that law enforcement continued to interrogate the accused after he invoked his right to counsel, the first question is "whether the accused actually invoked his right to counsel."

*Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d. 488 (1984). "It is fundamental that once a suspect invokes his right to counsel, all interrogation must cease." *State v. Colquitt*, 188 Ohio App.3d 509, 2010-Ohio-2210, 936 N.E .2d 76, ¶12; citing *State v. Turvey*, 84 Ohio App.3d 724, 732, 618 N.E.2d 214 (4th Dist.1992); *State v. Jobe*, 6th Dist. Lucas No. L-07-1413, 2009-Ohio-4066, ¶67. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d. 362 (1994); quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [the Court's] precedents do not require the cessation of questioning." Id. "Rather, the suspect must unambiguously request counsel." Id. As the Supreme Court observed, " 'a statement either is such an assertion of the right to counsel or it is not.' " Id.; quoting *Smith v. Illinois*, 469 U.S. 91, 97-98.

{¶79} Second, if we find that the accused did invoke his right to counsel, we "may admit his responses to further questioning only on finding

that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois* at 95; citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d. 378 (1981). "[A]n accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards* at 484-485; See, also, *State v. Van Hook*, 39 Ohio St.3d 256, 530 N.E.2d 883 (1988). "[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in Edwards [v. Arizona]." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830 (1983). Though the Supreme Court declined to fully define the term "initiate," it did note that "a willingness and a desire for a generalized discussion about the investigation * * * not merely a necessary inquiry arising out of the incidents of the custodial relationship" was sufficient to show initiation. *Bradshaw* at 1045-1046.

{¶80} Here, there has been no argument made that Appellant was not advised of his *Miranda* rights; thus, that issue is not in dispute. Further, the fact that Appellant made an unequivocal request for counsel soon after the

interrogation began is not in dispute. At issue, however, is whether Appellant subsequently waived his right to counsel and to remain silent after initially invoking those rights, by re-initiating conversation with Detective Conkel regarding the incident.

{¶81} A review of the transcript indicates that Appellant made unequivocal statements that he wanted a lawyer; however, the transcript also reveals that Detective Conkel responded "okay" each time, only for Appellant to continue talking and engaging with her. In fact, after Appellant made two requests, but continued to talk, Detective Conkel then followed up by specifically asking Appellant two different times whether he wanted to talk to an attorney or whether he wanted to talk to her. Both times Appellant continued to talk to Conkel.

{¶82} Although Detective Conkel continued to engage with Appellant when he continued talking with her, her comments were statements, rather than questions, regarding the crimes Appellant would be charged with once he was taken over to the jail, based upon the evidence gathered at the time. We believe these statements are properly classified as statements by a police officer relating to routine incidents of the custodial relationship, as described in *Oregon v. Bradshaw*. The only questions asked by Detective Conkel after Appellant requested counsel were made in response to Appellant's continued

conversation, and were asked to clarify whether Appellant wanted to keep talking to her, or whether he did, in fact, want counsel. Both times he was asked, Appellant made substantive statements about the investigation, rather than re-asserting his desire for counsel. For instance, Appellant continued to state that he didn't believe anyone would "go to bat" for him, that he bought cigarettes, not gas, at Kroger, that he had not committed any crimes, and ultimately that he didn't kill the victim but that Steinhauer stabbed him.

{¶83} We believe, based upon these facts, that despite Appellant's unequivocal request for counsel, Appellant subsequently waived his right to counsel by re-initiating conversation with Detective Conkel. We further believe that this decision is consistent with our prior decision in *State v. Adkins*, 4th Dist. Scioto No. 10CA3367, 2011-Ohio-5360, ¶¶25 and 27 (finding defendant waived his prior invocation of the right to counsel by re-initiating the interrogation with discussion of his innocence). In light of this determination, we necessarily must conclude that the filing of a motion to suppress would have been futile. Thus, we cannot conclude that trial counsel's failure to file a motion to suppress on these grounds constituted deficient performance. As such, we reject this portion of Appellant's argument under this assignment of error.

FAILURE TO REQUEST INDEPENDENT DNA TESTING

**{¶84}** Appellant contends that trial counsel was ineffective for failing to request independent DNA testing of the hatchet prior to the hatchet being lost by the Scioto County Sheriff's Office. The State counters by arguing that an independent test would likely have confirmed the State's DNA test result and could have resulted in a scenario in which the State could have called Appellant's expert as a witness against him. The State suggests this may have been a scenario in which Appellant's trial counsel elected to avoid such a result by not having independent testing performed.

**{¶85}** Here, there is no way Appellant's trial counsel could have known or anticipated that the hatchet would be lost. Appellant was indicted for the crimes at issue on March 26, 2012. Appellant's counsel promptly filed a motion to preserve evidence on April 4, 2012, which was granted the next day. As soon as trial counsel was informed of the loss of the hatchet, on October 2, 2012, he filed a motion to dismiss based upon the loss of the evidence, and in the alternative, a motion prohibiting the use of any and all testimony about the knife and hatchet. These motions were denied by the trial court and we have determined, in our analysis under Appellant's first assignment of error, the trial court did not err in denying those motions, as Appellant has not demonstrated bad faith on the part of the State in connection with the loss of the evidence.

{¶86} Based upon the information before us, it appears trial counsel intended to request independent DNA testing as a motion to preserve evidence was filed. Whether trial counsel simply ran out of time when it was determined the hatchet was missing, or whether trial counsel made a strategical decision not to have the evidence independently tested in light of the State's test results cannot be determined and calls for speculation, which is not a proper function of this Court. Although trial counsel could have requested independent testing in a more timely fashion, had it been his plan and intention to do so, as set forth above, there was no way that the loss of the evidence could have been anticipated.

{¶87} Additionally, other courts have reasoned that " '[t]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.' " *State v. Jones*, 9th Dist. Summit No. 26226, 2012-Ohio-2744, ¶18; quoting *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). Here, the State presented Raymond Peoples as their expert and defense counsel cross-examined Peoples regarding the DNA tests he performed. Further, as in *Jones*, Appellant fails to set forth any argument that the DNA testing the State's expert performed was faulty or unreliable. Id.

{¶88} Under these facts, we cannot conclude that counsel's performance was deficient or prejudicial.  Further, it is reasonable that once it was determined by the State's expert that Appellant's DNA was present on the hatchet, contrary to Appellant's claim that he never touched the hatchet, that counsel made a strategical decision not to obtain independent testing. As such, we reject this portion of Appellant's argument under this assignment of error.

## FAILURE TO REQUEST A CURATIVE INSTRUCTION ON HEARSAY

{¶89} Appellant contends that trial counsel was ineffective for failing to request a curative instruction in regards to the hearsay statements attributable to his co-defendants that were admitted into evidence through the testimony of Detective Conkel, which were contained in the videotape of the Appellant's interview that was played for the jury.  In response to this argument, the State points out that the trial court instructed the jury, though generally and not in curative fashion, regarding the statements made by Detective Conkel during the interrogation.

{¶90} In light of our disposition of Appellant's fourth assignment of error, which determined that Appellant's confrontation rights were technically violated by virtue of the allowance into evidence of Appellant's co-defendants hearsay statements through the testimony of Detective

Conkel, this argument is arguably moot. However, we are unwilling to conclude counsel was ineffective in any regard with respect to the admission of these statements as trial counsel for Appellant specifically objected to the admission of these statements prior to the interview tape being played for the jury, and the objection was the subject of a hearing in chambers which was ultimately overruled by the trial court. Further, trial counsel renewed his objection at the start of the tape being played.

{¶91} Additionally, as noted by the State and as discussed more fully under Appellant's fourth assignment of error, the trial court gave a lengthy instruction of a limiting nature regarding the statements made by Detective Conkel during the interview. Thus, as the trial court provided an instruction to the jury prior to deliberations, there was no need for counsel to request a further instruction. As such, we reject this portion of Appellant's argument under this assignment of error.

FAILURE TO OBJECT TO IMPROPER OPINION TESTIMONY

{¶92} Appellant contends that trial counsel was ineffective for failing to object to improper opinion testimony. Specifically, Appellant argues expert fire investigator, Roman Brandau, was permitted to testify regarding physical injuries sustained by the victim, and that his testimony included his opinion that the wounds on the victim's head were from trauma likely

related to a hatchet. Although Appellant argues that trial counsel likely would have prevailed on this objection, had it been made, he fails to articulate how the result of the trial would have been different if this testimony had been excluded.

{¶93} At trial, the State presented the testimony of Dr. Brian Casto, the deputy coroner and forensic pathologist who performed the autopsy on the victim. Dr. Casto was qualified as an expert, without objection, and opined that the injuries sustained by the victim were "created with a sharp instrument for the stab wounds, like a knife. The chops [sic] wounds are created with a [sic] instrument that has a cutting edge and is heavy. Okay. Like a hatchet or something like that." Dr. Casto further opined as follows:

"there's multiple chop style wounds of the head. And these are cuts of the scalp of the head accompanied by underlying crushing of the skull. And that's why they're designated as chop wounds rather than just a simple stab."

{¶94} In light of this expert opinion testimony that was properly admitted without objection, Appellant cannot demonstrate how the result of the proceeding would have been different if a statement by the fire investigator regarding what he perceived to be hatchet wounds on the victim's head would have been objected to and thus excluded. As such, we

again reject this portion of Appellant's argument under this assignment of error.

### FAILURE TO OBJECT TO THE TRIAL COURT'S IMMIGRATION COMMENTS

{¶95} Appellant contends that trial counsel was ineffective for failing to object to the trial court's "immigration comments." As set forth above, during trial the trial court stated as follows after Appellant attempted to elicit testimony from Detective Conkel that the victim's work visa has expired:

> "I'm going to instruct the jury at this time that citizenship status has no bearing on this case. I don't know whether he's a citizen or not, but everybody has a right to live. Okay."

However, in light of our determination under Appellant's third assignment of error that the trial court's instruction to the jury regarding Appellant's citizenship status did not merit a challenge based upon judicial bias or partiality, we cannot conclude that trial counsel's failure to object to the trial court's statements constituted ineffective assistance of counsel. This is true especially in light of the trial court's later limiting instruction given to the jury prior to deliberations. As such, we also reject this portion of Appellant's argument under this assignment of error.

### FAILING TO CALL ANY WITNESSES ON APPELLANT'S BEHALF

{¶96} Although Appellant sets forth this argument under this assignment of error in his statement of his assignments of error, he fails to argue this alleged error in the body of his brief. App.R. 16(A)(7) requires an appellant's brief to include the "contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Further, App.R. 12(A)(2) provides that "[t]he court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." Based upon this authority set forth in the appellate rules, we decline to address this portion of Appellant's argument under this assignment of error.

{¶97} Accordingly, we have found no merit to any of the claims of ineffective assistance of counsel raised by Appellant. Thus, we find no merit to Appellant's sixth assignment of error and it is, therefore, overruled.

## ASSIGNMENT OF ERROR VI

{¶98} In his sixth assignment of error, Appellant contends that the trial court erred when it granted the State's motion in limine which prevented him from appropriately cross examining witness Steven

Drummond.  Appellant argues that he should have been permitted, under

Evid.R. 608(B) to cross-examine Drummond regarding statements made to

law enforcement during their investigation of an incident which

subsequently led to a felony charge filed against Drummond, which

Appellant argued were probative of Drummond's character for truthfulness

or untruthfulness. Appellant further argues that his trial counsel was

ineffective for failing to cross examine Drummond regarding any plea deals

he had been offered in exchange for his testimony.

It appears from the record that the charge against Drummond was still

pending at the time of trial, and that he had not been convicted of the charge

at that time.

{¶99} Generally, appellate courts do not directly review in limine

rulings.  *State v. Hapney*, 4th Dist. Washington No. 01CA30-31, 2002-Ohio-

3250, ¶55; citing *State v. White*, 4th Dist. Gallia No. 95CA08, 1996 WL

614190. Such rulings are tentative and interlocutory and made by a court

only in anticipation of its actual ruling on evidentiary issues at trial. See

*McCabe/Marra Co. v. Dover*, 100 Ohio App.3d 139, 160, 652 N.E.2d 236,

250 (8th Dist.1995); *Collins v. Storer Communications, Inc.*, 65 Ohio App.3d

443, 446, 584 N.E.2d 766 (1989). Thus, the grant or denial of a motion in

limine does not preserve any error for review. See *State v. Hill*, 75 Ohio

St.3d 195, 202-203, 661 N.E.2d 1068 (1996). Rather, in order to preserve the error, the evidence must be presented at trial, and a proper objection lodged. See *State v. Brown*, 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus (1988); *State v. Grubb*, 28 Ohio St.3d 199, 503 N.E.2d 142, paragraph two of the syllabus (1986). An appellate court will then review the correctness of the trial court's ruling on the objection rather than the ruling on the in limine. See *White*, supra; *Wray v. Herrell*, 4th Dist. Lawrence No. 93CA08, 1994 WL 64293.

{¶100} Here, the State's motion in limine was filed at 7:51 a.m. on October 9, 2012, the morning of the first day of trial. The trial court and counsel discussed the motion at length in chambers prior to the start of jury selection and the trial court granted the State's motion. Mr. Drummond testified just three days later. Because this was a situation in which a motion in limine was granted in favor of the State thereby preventing Appellant from asking certain questions of the witness, rather than a situation in which a motion in limine was denied, thereby making it incumbent upon defense counsel to renew his objection, we believe the issue was sufficiently preserved for appellate review. Thus, we will address Appellant's argument not in terms of the grant or denial of the motion in limine, but instead in terms of whether or not the trial court abused its discretion in excluding

evidence which Appellant contends would have called Drummond's character for truthfulness and thus, his credibility, into question.

{¶101} "A trial court has broad discretion in the admission or exclusion of evidence, and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to defendant." *State v. Green*, 184 Ohio App.3d 406, 2009-Ohio-5199, 921 N.E.2d 276, ¶ 14 (4th Dist.); citing *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, ¶ 33 (4th Dist).

{¶102} Abuse of discretion is more than an error of law or judgment; rather, it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Herring*, 94 Ohio St.3d 246, 255, 2002-Ohio-796, 762 N.E.2d 940; *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). When an appellate court applies this standard, it cannot substitute its judgment for that of the trial court. *State v. Jeffers*, 4th Dist. Gallia No. 08CA7, 2009-Ohio-1672, ¶12; *In re Jane Doe I*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991); citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990).

{¶103} Evid.R. 608 governs evidence of character and conduct of a witness and provides in (B) that "[s]pecific instances of conduct of a

witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of a crime as provided in Evid.R. 609, may not be proved by extrinsic evidence." " 'Other than the Evid.R. 609 exception for certain criminal convictions, a witness's credibility may not be impeached by extrinsic proof of special instances of his conduct; such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B). Criminal activities not resulting in conviction cannot ordinarily form the basis for an attack upon a witness's credibility.' " *State v. Jacobs,* 4th Dist. Highland No. 11CA26, 2013-Ohio-1502, ¶31; citing *State v. Hurt*, 158 Ohio App.3d 671, 2004-Ohio-4266, 821 N.E.2d 1033, ¶11; citing *State v. Skatzes*, 2nd Dist. Montgomery No. 15848, 2003-Ohio-516, ¶183.

{¶104} Of importance, we initially note that the pending felony of which Drummond was charged has not been identified in the record. However, in Appellant's memorandum contra the State's motion in limine, Appellant stated that "[t]he charges for which the witness is currently indicted for do not appear to be charges of dishonesty." Nonetheless, Appellant argues he should have been able to cross examine Drummond on an allegedly false statement provided to law enforcement during the course of the investigation related to Drummond's pending felony charge. In

making this argument, Appellant reasoned that if Drummond lied to police during the investigation, such conduct was probative of his character for truthfulness.

{¶105} We reject Appellant's argument. Drummond had not been convicted of the crime for which he was charged at the time of trial and, further, Appellant has conceded that crime was not a crime of dishonesty. See *State v. Drummond*, 111 Ohio St.3d 14 at ¶101 (holding that the trial court did not abuse its discretion by rejecting cross examination of three witness regarding their pending charges where the charges were not probative of their character for truthfulness or untruthfulness). Additionally, it had not been determined that the statement given to law enforcement by Drummond during the course of the investigation of his pending felony, which Appellant sought to introduce, was false. As noted by the trial court in ruling on the motion in limine, "[w]e're -- we're not trying a separate case here. This -- will be up to the jury to try it on his own case -- his own case to make that determination." The trial court further stated "[w]hether he told a lie or told the truth is a separate matter, and to be decided by a separate jury. This is a whole completely different case here today, so I'm going to grant the State's motion." Based upon the foregoing, we find no abuse of discretion on the part of the trial court in excluding evidence of Drummond's

pending charges or statements made to law enforcement during the investigation of those pending charges.

{¶106} We now address Appellant's argument that his counsel provided ineffective assistance by failing to cross examine Drummond as to whether he had been offered a plea deal in exchange for his testimony. "The pendency of charges in another case or the witness's plea arrangement with the prosecutor is admissible to prove the bias of the witness." *State v. Drummond* at ¶104; citing *State v. Brooks*, 75 Ohio St.3d 148, 152, 661 N.E.2d 1030 (1996); *State v. Hector* (1969), 19 Ohio St.2d 167, 249 N.E.2d 912, paragraph five of the syllabus (1969) (predates evidentiary rules); see 1 McCormick, Evidence (5th Ed.1999) 147, Section 39 (bias includes evidence that "an indictment is pending against [the witness], the witness has not been charged with a crime, has been promised leniency, * * * [or] is awaiting sentence"); see, also, Giannelli & Snyder, Evidence (2d Ed.2001) 562, Section 616.3.

{¶107} Here, there was no evidence that Drummond was offered a plea bargain or any other inducement to testify. In fact, the State expressly stated in its motion in limine as follows:

"The State of Ohio did not enter into any negotiations with Drummond in exchange for his testimony; therefore, the

admission of evidence or testimony regarding Drummond's

charges would not be for legitimate purpose, such as bias."

We conclude that trial counsel could have reasonably relied upon this

representation by the State, made in an official document filed with the

court. Further, the fact that Drummond was incarcerated was disclosed to

the jury during trial. As such, the jury was aware that Drummond may have

some incentive to assist the State. Based upon these facts, we conclude

Appellant's failure to cross-examine on this issue does not constitute

ineffective assistance of counsel.

{¶108} In light of the foregoing, we find no abuse of discretion on the

part of the trial court in excluding the evidence at issue. Further, Appellant

has failed to demonstrate ineffective assistance of trial counsel. Thus, we

find no merit to Appellant's sixth assignment of error and it is, therefore,

overruled.

## ASSIGNMENT OF ERROR VII

{¶109} In his seventh assignment of error, Appellant contends that he

was denied due process of law and the right to a fair trial when the State set

forward a theory of prosecution at trial that was inconsistent with the bill of

particulars previously filed. In support of his argument, Appellant sets forth

the bill of particulars, as provided by the State, and then argues that contrary

to the bill of particulars, the State's theory at trial was that the death of the victim occurred while he was standing outside of the vehicle, and that he was killed as a result of ambush. Because we conclude Appellant has mischaracterized the evidence presented at trial, and further because we have found no discrepancy between the bill of the particulars and the State's theory at trial, we reject Appellant's argument.

{¶110} A review of the record reveals that the State filed a bill of particulars on May 1, 2012, which stated as follows:

"On or about the 7th day of March, 2012, in Scioto County, Ohio defendant did, with purpose to commit, promote, or facilitate the commission of a [sic] aggravated murder, with Raymond J. Linkous and Thomas Steinhauer, plan or aid in planning the commission of such offense and/or agree with each other that one or more of them would engage in conduct that facilitated the commission of aggravated murder or murder, and in furtherance of said conspiracy the defendant and the other conspirators, did, among other things, procure weapons and travel to the residence of the deceased, Felipe Lopez. The defendants then entered a vehicle with the victim and headed towards Otway, Ohio. Defendant's [sic] then attacked the

victim by stabbing him repeatedly, striking him in the head with

a hatchet, drove to Kentucky and then back to Ohio with the

victim still in said vehicle. The defendants, positioned the

victim in the vehicle which they doused with gasoline and set

on fire causing the death of the victim, Felipe Lopez.

Defendant with Raymond J. Linkous and Thomas Steinhauer

did dispose of cell phones, a knife, a hatchet, clothing and other

personal items, with purpose to impair its availability as

evidence in such proceeding or investigation."

Thus, the bill of particulars filed by the State specified that the victim was

stabbed with a knife and struck with a hatchet, and did not specify the exact

location in which these events occurred. Further, the bill of particulars

alleged that the death of the victim was ultimately caused by the fire.

{¶111} At trial, the State, in its opening statement, set forth a theory

that included injuries to the victim from a knife and hatchet, but then stated

that the victim was still alive when he was set on fire, based upon inhalation

injuries that were also present. This theory is consistent with the bill of

particulars. Further, the State presented expert testimony from deputy

coroner and forensic pathologist Dr. Bryan Casto. Dr. Casto testified that he

performed the autopsy on the victim and that in performing the autopsy he

identified multiple stab wounds, as if from a knife, as well as chop wounds, as if from a hatchet.  He also testified that part of the purpose of the autopsy was to determine whether the victim was alive or dead during the fire.  Dr. Casto testified that due to the presence of inhalation thermal injuries, the victim "was alive during the fire, and actually inhaled hot gases and soot." As such, the expert testimony presented by the State was also consistent with the bill of particulars.

{¶112} In light of the foregoing, we reject Appellant's contention that the State's theory at trial was inconsistent with the bill of particulars. Although the State did, at times, use the word "ambush" to describe the way in which the victim was initially attacked, we see no inconsistency with the bill of particulars.  As such, we find no merit to Appellant's argument. Further, we agree with the State that they are not bound to the exact information contained in the bill of particulars.

{¶113} As noted by the State, in *State v Lantz*, 4th Dist. Vinton No. 475, 1992 WL 129327, *6 (June 10, 1992), this Court was presented with the argument that "the purpose of the bill of particulars is "entirely defeated when evidence contrary to the bill of particulars is offered by the state.' " In rejecting that argument, we noted that "[a] defendant must not rely upon the bill of particulars for the specification of evidence. The defendant must not

use the bill of particulars as a substitute for discovery." Id.; see also *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985) (" * * * A bill of particulars is not designed to provide the accused with specifications of evidence or to serve as a substitute for discovery.") Thus, even if the State had introduced evidence or advanced a theory inconsistent with that set forth in the bill of particulars, Appellant cannot rest on the bill of particulars alone to determine and prepare his defense. Accordingly, and in light of the foregoing, Appellant's seventh assignment of error is without merit and is, therefore, overruled.

## ASSIGNMENT OF ERROR VIII

{¶114} In his eighth assignment of error, Appellant contends that cumulative errors committed during his trial deprived him of a fair trial and require reversal of his convictions. The cumulative-error doctrine states that a conviction will be reversed if the cumulative effect of all the errors in a trial deprive a defendant of the constitutional right to a fair trial, even though each alleged instance of error may not individually constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); also see *State v. Jackson*, 4th Dist. Pickaway No. 11CA20, 2012-Ohio-6276 ¶51.

{¶115} Although we found, under Appellant's fourth assignment of error, that the trial court abused its discretion in admitting improper hearsay evidence in the form of statements by Appellant's co-defendants and, as such, that his Sixth Amendment rights under the Confrontation Clause were violated, we determined that sufficient other evidence in the record supported Appellant's convictions. Further, we have not found merit in any of the other assignments of error raised by Appellant. Although the trial court did err, as discussed above, the error was harmless beyond a reasonable doubt in light of the other evidence in the record supporting Appellant's convictions. As such, Appellant's eighth and final assignment of error is without merit and is, therefore, overruled.

**JUDGMENT AFFIRMED**.

Harsha, J., concurring:

### I.  Assignment of Error I – Standard of Review

**{¶116}** I concur in the judgment overruling Gerald's assignments of

error and affirming his convictions and sentence.  But in the first assignment

of error I would apply the hybrid standard of review set forth in Judge

Abele's principle opinion in *State v. Fox*, 4th Dist. Ross No. 11CA3302,

2012-Ohio-4805, 985 N.E.2d 532, ¶22:

> We believe, however, that the hybrid standard of review that
> appellate courts apply to suppression motions and motions to
> dismiss on the basis of a violation of a defendant's speedy trial
> right is the more appropriate standard of review to apply when
> reviewing a trial court's decision regarding a motion to dismiss
> on the basis that the state failed to disclose materially
> exculpatory evidence. See *State v. Geeslin,* 116 Ohio St.3d 252,
> 2007-Ohio-5239, 878 N.E.2d 1, ¶ 14 (not specifically setting
> forth any standard of review, but deferring to trial court's
> factual finding that tape erasure accidental when reviewing
> motion to dismiss on basis that state failed to turn over
> materially exculpatory evidence).

**{¶117}** Nevertheless, I agree that Gerald's first assignment of error is

meritless even under that standard of review.

### II.  Assignment of Error IV – Constitutional Harmless Error

**{¶118}** I agree the trial court erred in admitting the

hearsay/testimonial statements of Gerald's co-defendants.  Under a

harmless-error analysis the state bears the burden of demonstrating that the

error in admitting the hearsay statements of his co-defendants through the testimony of Detective Conkel did not affect Gerald's substantial rights. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶15; *State v. Lusher*, 2012-Ohio-5526, 982 N.E.2d 1290, ¶63 (4th Dist.). "'Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence.  Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶46, quoting *Conway* at ¶78.

{¶119} There are several reasons that I join the principal opinion in finding that the error was harmless beyond a reasonable doubt.  First, the remaining evidence standing alone constitutes overwhelming proof of Gerald's guilt.  This evidence includes:  (1) the testimony of Kelly Lopez, the wife of the decedent, that on the day the crimes occurred, she saw Gerald with Lopez and that Lopez told her that he was leaving with Gerald, Steinhauer, and Linkous; (2) Detective Conkel's testimony, admitted without objection, that her investigation disclosed that the defendants had planned to attack Lopez and brought weapons with them, that they all left in a truck with Lopez, that Steinhauer stabbed Lopez, that Gerald hit Lopez in

the head with a hatchet, that they disposed of the hatchet and showered, and that Gerald changed his story several times, (3) the taped interview of Gerald by Detective Conkel, in which he changed his story, eventually admitting that he was present when Lopez was attacked and killed; (4) the testimony of BCI DNA expert Raymond Peoples, who testified that the hatchet submitted included Gerald's DNA on its handle; and (5) the testimony of Gerald's county jail cellmate Steven Drummond stating that Gerald told him that he hit Lopez in the back of his head with the hatchet and that the three defendants disarmed him, attacked him, and set the truck with his body in it on fire because they could not pay off a $5,000 drug debt.

{¶120} Notably, in the absence of an objection by Gerald's trial counsel to Detective Conkel's testimony concerning the conclusions of her investigation, Gerald forfeited all but plain error on that issue. Insofar as Gerald argues in part in his fourth assignment of error that this testimony constituted hearsay, his failure to object (which he fails to mention) forfeits the error. And because Gerald does not specifically argue that the admission of this testimony constituted plain error, I would not address it. *See State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, (2002), *See also State v. Maple*, 9th Dist. Summit No. 25313, 2011-Ohio-1216, ¶12 (appellant forfeited the argument that the trial court erred by admitting hearsay by

failing to object at the trial court; appellate court would not address it as plain error because it was not argued as such on appeal); *Faulks v. Flynn*, 4th Dist. Scioto No. 13CA3568, 2014-Ohio-1610, ¶35 (finding lack of exceptional circumstances under similar facts). And, because Gerald repeatedly reinitiated his conversation with Detective Conkel, the trial court did not err in admitting Gerald's statements to Detective Conkel as he contends in his fifth assignment of error. Therefore, these statements contributed substantial proof of Gerald's guilt.

{¶121} Finally, the jurors did not have to rely upon the improper testimonial evidence to find him guilty of the charged crimes; untainted evidence established his guilt as an accomplice. *See Hood* at ¶44 (holding that constitutional error in admitting evidence was harmless beyond a reasonable doubt by noting that, among other reasons, the jurors did not have to believe that Hood pulled the trigger to find him responsible for the victim's death). As the principal opinion notes in overruling the second assignment of error, Gerald in effect concedes that his conviction for conspiracy to commit aggravated murder and murder is supported by the evidence; he cannot now complain of being convicted as an accomplice to the remaining crimes of aggravated murder, murder, aggravated arson, and arson. Gerald admitted that he was in the truck with Lopez, Steinhauer, and

Linkous, with weapons, for the purpose of at least intimidating Lopez. This confrontation ended with Lopez being stabbed with a knife, struck in the head with a hatchet, and burned alive in the truck. Gerald was present during the crimes and assisted in their perpetration.

{¶122} Consequently, I conclude there is no reasonable possibility that the tainted evidence might have contributed to Gerald's convictions. Therefore, I concur in the court's judgment.

Hoover, J.: Dissents.

{¶123} I respectfully dissent.

{¶124} I agree with the principal opinion that the testimonial statements of Detective Conkel that co-defendants Linkous and Steinhauer had implicated Gerald in the crimes should have been barred by the Confrontation Clause. The admission of the statements violated Gerald's Sixth Amendment right to confrontation. A constitutional error is not prejudicial if the error is " 'harmless beyond a reasonable doubt.' " *State v. Love,* 4th Dist. Ross No. 05CA2838, 2006–Ohio–1824, ¶34, quoting *Chapman v. California*, 386 U.S. 18, 24. 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "[E]rror is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), at paragraph six of the syllabus; *State v. Woods,* 4th Dist. Ross No. 09CA3090, 2009–Ohio–6169, ¶27; *see also*, *State v. Conway,* 108 Ohio St.3d 214, 2006–Ohio-791, 842 N.E.2d 996, ¶78.  In light of the constitutional violation along with other problematic issues in this case, I would find that the error was not harmless beyond a reasonable doubt.  I would reverse and remand this case for a new trial.

{¶125} First of all, we must look to the evidence that was actually presented and that was properly admitted. The only other witness other than Detective Conkel that actually testified regarding Gerald striking Lopez with the hatchet was Steven Drummond who was an inmate in the Scioto County Jail during the same time that Gerald was incarcerated. Testimony of a fellow inmate may not necessarily be considered as "overwhelming proof of defendant's guilt." At the very least, Drummond, as a fellow inmate, would have credibility issues and one may not believe him "beyond a reasonable doubt."

{¶126} Raymond Peoples, a BCI & I forensic scientist testified that Gerald's DNA was on the handle of the hatchet; however, Linkous's DNA was also on the hatchet's handle. Gerald was unable to independently test the hatchet due to the fact that the hatchet was lost while in the State's custody and the State completely consumed the DNA sample. Given the lost evidence and consumption of evidence issues, including the Scioto County Sheriff's Department loss of the hatchet, a knife, and a gun that Lopez supposedly had with him, Peoples' testimony may not necessarily be considered as "overwhelming proof of defendant's guilt."

{¶127} Lastly, statements were introduced in which Gerald incriminated himself by admitting to Detective Conkel that he was present

and witnessed Steinhauer stab Lopez and Linkous set fire to the truck. Further statements included his admission to being in the truck with the group. Gerald specifically denied any knowledge of the hatchet and denied hitting Lopez with the hatchet, although through Raymond Peoples' testimony, Gerald's DNA was on the handle of the hatchet. If this were the end of the analysis, a reasonable person could find that these statements and the expert's testimony together showed "overwhelming proof of defendant's guilt." However, Gerald also claimed ineffective assistance of counsel when his counsel failed to file a motion to suppress his statements after he had invoked his right to counsel.

{¶128} "It is fundamental that once a suspect invokes his right to counsel, all interrogation must cease." *State v. Colquitt*, 188 Ohio App.3d 509, 2010-Ohio-2210, 936 N.E.2d 76, ¶12 (4th Dist.), citing *State v. Turvey*, 84 Ohio App.3d 724, 732, 618 N.E.2d 214 (4th Dist.1992); *State v. Jobe*, 6th Dist. Lucas No. L–07–1413, 2009-Ohio-4066, ¶67. If the police proceed to interrogate the suspect after he initiates communication, then a court must determine whether the suspect validly waived his previously-invoked right to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 52. "[T]he burden [is] upon the prosecution to show that

subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw* at 1044.  Such a waiver must be knowing and intelligent and a court must find it to be so " 'under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " *Bradshaw* at 1046, quoting *Edwards v. Arizona*, 451 U.S. 477, 486, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), fn. 9.

{¶129} In the case sub judice, it is clear that Gerald invoked his right to counsel. The transcript demonstrates that the following dialogue took place between Gerald and Detective Conkel:

* * *

"DEFENDANT:     I want a lawyer.

CONKEL:            Okay. That's your choice.

DEFENDANT:      I want a lawyer because I don't feel like anybody's going to go to bat for me at all. You guys are just going to charge me with some murder I didn't do.

CONKEL:            Okay.

DEFENDANT:     And lock me up and throw away the key. I mean, I understand—

CONKEL:            Okay. You want an attorney, so we're going to

                   give you a chance to get an attorney.

DEFENDANT:         Well, I'm just saying I understand how you guys

                   do things. You know, you're saying I'm guilty, but

                   I'm not.

CONKEL:            Well, I'm going to tell—what I'm going to tell you

                   is we've got eyewitnesses who can place you out

                   on 104, who can place you at the place where it

                   was burnt, and place you where the gas was

                   bought. Okay. I'm just—

DEFENDANT:         But I didn't buy gas. I bought cigarettes.

CONKEL:            Right. Jimmy paid for the gas. I know that. Like I

                   said, you want an attorney. We'll take you over to

                   jail. I'll tell you what you'll be charged with

                   tonight. It looks like it will be aggravated

                   murder—

DEFENDANT:         Jesus Christ, you're kidding me?

CONKEL:            It'll be tampering with evidence.

DEFENDANT:         Tampering with evidence?

CONKEL:            Abuse of a corpse.

DEFENDANT:      What do you mean abuse of a corpse?

CONKEL:         Those are all charges involved in the crimes that were done tonight.

DEFENDANT:      But I didn't do none of those things.

CONKEL:         Like I said, you—do you want to talk to me without an attorney or do you want an attorney, because I can hear your side of the story, but that's only if you want to talk to me. That's totally up to you.

DEFENDANT:      But my side of the story—you're going to hang me out to dry.

CONKEL:         Honey, I'm not hanging you out to dry.

DEFENDANT:      I don't understand.

CONKEL:         I wasn't there. I didn't do this. I didn't see anything. I'm just telling you what the evidence says, and I'm just telling you what we've got. What we've seen. We've got people who places you where the –where the vehicle was on fire, which I already know Jimmy set it on fire. Jimmy's the one who set it on fire. He's admitted

to that. Lit a rag, threw it in the truck. He's—he's

taking the blame for that. Okay. I've got witnesses

placing you there. I've got you at Kroger's, and

I've got witnesses drove by that seen you on 104

where the incidents were taking place.

DEFENDANT:    I didn't kill the man.

CONKEL:       It's up to you—do you—do you want to continue-

do you want to talk to me without an attorney or

do you want me to take you on over? That's your

choice, because you told me you wanted an

attorney, so I have to ask you.

DEFENDANT:    Him and Thomas got into a fight in the truck and

he stabbed the living shit out of him.

CONKEL:       Okay. Back me up from the beginning. How did

you guys end up over there?"

* * *

Gerald then proceeded to give a full statement to Detective Conkel.

{¶130} In *Oregon v. Bradshaw*, supra, the United States Supreme

Court explained that inquiries or statements by the defendant relating to

routine incidents of the custodial relationship, such as requesting a drink of

water or requesting to use the telephone, are generally not deemed to have initiated a conversation. *Id.* at 1045. On the other hand, a question regarding what is going to happen next "evince[s] a willingness and a desire for a generalized discussion about the investigation [and is] not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045-1046. In this case, the questioning continued after Gerald invoked his right to counsel; the issue then is who reopened the dialogue, Gerald or Detective Conkel? Viewing the quoted dialogue, the statements made by Gerald after he asked for a lawyer do not fit squarely under "routine incidents" nor does he ask, "What is going to happen next?"

{¶131} Since the right to counsel as guaranteed by the United States Constitution and the Ohio Constitution, is a cornerstone of our criminal justice system, the issue of whether Gerald's Fifth Amendment right to counsel was waived must be scrutinized. After Gerald invoked his right to counsel, Detective Conkel did not stop the interrogation. It appears that Detective Conkel is an extremely skilled interviewer that knows how to keep the interviewee speaking. After Gerald requested a lawyer, Detective Conkel answered him with an "Okay. That's your choice." However, she then continued to tell him about evidence that the State already had against him. She also continued the dialogue by telling Gerald about the particular

charges with which he would be charged such as aggravated murder, tampering with evidence, and abuse of a corpse.  Being experienced and trained in interviewing, Detective Conkel's interviewing techniques were designed to elicit a response from Gerald.  Gerald then responded by wanting to "tell his side of the story."  Keeping in mind that the burden is on the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during interrrogation, I would find that Gerald did not reopen the dialogue.  The dialogue never stopped as it should have once Gerald requested an attorney.

{¶132} Gerald's assignment of error is couched in terms of ineffective assistance of counsel.  To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998).

{¶133} Even being cognizant of trial counsel's possible strategies in not filing a motion to suppress, I would find that, in this particular case, Gerald's trial counsel's performance was deficient by failing to file the

motion to suppress his statements since Gerald had invoked the right to counsel without waiving that right. Gerald must next show that, but for the alleged errors, the result of the proceeding would have been different.

{¶134} "The cumulative-error doctrine that Gerald argues in his assignment of error VIII should then be considered. The cumulative error doctrine states that a conviction will be reversed if the cumulative effect of all the errors in a trial deprive a defendant of the constitutional right to a fair trial, even though each alleged instance of error may not individually constitute cause for reversal." *State v. Mockbee,* 2013-Ohio-5504, 5 N.E.3d 50, ¶43 (4th Dist.), citing *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); *see also State v. Jackson,* 4th Dist. Pickaway No. 11CA20, 2012-Ohio-6276, ¶51. Viewing the trial as a whole, and considering that a Confrontation Clause violation occurred when the court allowed the jury to hear the statements of the co-defendants without Gerald being able to cross-examine the co-defendants; along with the fact that Gerald's Fifth Amendment right to counsel was violated; and the fact that the hatchet, knife, and a gun were lost during the case, I would find that the cumulative error doctrine is applicable in this case.

{¶135} Going back full circle to the harmless error test, if we do not consider the testimony of Detective Conkel where she quotes Gerald's co-

defendants in violation of the Confrontation Clause; and Raymond Peoples'

testimony is considered in light of the lost hatchet; and if Gerald's statement

is not considered given his Fifth Amendment right to counsel, then the trier

of fact is left with the inmate, Steven Drummond's testimony to find Gerald

guilty beyond a reasonable doubt.  It is difficult to find that the errors were

harmless in this case.  After considering the entire record and the

constitutional violations, I would sustain Gerald's Assignments of Error IV,

V with respect to the failure to file the motion to suppress and VIII. I would

find all other assignments of error moot.  I would reverse and remand the

case for a new trial.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.:   Concurs with Concurring Opinion.
Hoover, J:   Dissents with Dissenting Opinion.

For the Court,

BY: _____
Matthew W. McFarland, Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**